1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIM CORONADO, JR., | Case No. 1:15-cv-00806-AWI-SAB |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS RECOMMENDING THAT PLAINTIFF'S SOCIAL SECURITY APPEAL BE GRANTED IN PART |
| v. | |
| COMMISSIONER OF SOCIAL SECURITY, | (ECF Nos. 27, 32, 33) |
| Defendant. | OBJECTIONS DUE WITHIN FOURTEEN DAYS |

## I.

## INTRODUCTION

Plaintiff Tim Coronado, Jr. ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his deceased wife, Rosalinda Coronado's ("Claimant") application for disability benefits under Title II of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone for findings and recommendations to the District Judge.

Claimant's impairments included cervical and lumbar degenerative disc disease, bilateral carpal tunnel syndrome ("CTS"), myofascitis, and nerve impingement in her shoulders. For the reasons set forth below, Plaintiff's social security appeal should be granted in part and remanded for further administrative proceedings.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

On May 5, 2008, Claimant filed a Title II application for disability benefits alleging disability beginning on February 1, 2005.  (AR 249-56.)  On August 27, 2008, Claimant's claim was initially denied, and it was denied upon reconsideration on February 23, 2009.  (AR 128-40.) Claimant requested and received a hearing before Administrative Law Judge Timothy Snelling ("the ALJ").  On April 1, 2010, Claimant appeared at a hearing before the ALJ.  (AR 68-106.) On December 17, 2010, the ALJ denied Claimant's application for disability benefits.  (AR 109-20.)  Claimant appealed to the Appeals Council, and on September 27, 2012, the Appeals Council remanded Claimant's case back to the ALJ.  (AR 122-25.)  The Appeals Council remanded the matter so that the ALJ could get a vocational expert ("VE"), verify that the limitations that he had placed on Claimant in the prior decision were within the capacity of her past relevant work, and give further consideration to Claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations.  (AR 124.)

On July 5, 2013, the ALJ conducted a second hearing.  (AR 35-67.)  On August 30, 2013, the ALJ issued another unfavorable decision. (AR 19-28).  Claimant appealed to the Appeals Council, which denied her request for review on March 24, 2015.  (AR 1-5.)

### A.   Hearing Testimony From the First Hearing

Claimant appeared with counsel at the first hearing before the ALJ on April 1, 2010.  (AR 68-106.)  Claimant testified as follows:

Claimant had an eleventh grade education, did not receive a GED, did not have any schooling after eleventh grade, and did not have any vocational training.  (AR 72.)  Claimant worked in the food service industry doing food preparation as a caterer.  (AR 74.)  Claimant did a lot of lifting, pushing, grasping overhead, slicing, repetitive movements, and bending.  (AR 74.)  At the time Claimant left her job in 2005, she was lifting about 15 to 20 pounds.  (AR 74.) Claimant had to lift a metal cart weighing 70 pounds into a van one time in 1996, which caused her to hurt her back.  (AR 75.)

Claimant injured her hands, neck, and shoulders at her job in 2003.  (AR 74, 76-77.) When she returned to work in 2004 to 2005, they changed her job duties to modified work where the most she had to lift was 10 pounds.  (AR 77.)  The modified work was light-duty work like paperwork and filing work in the office.  (AR 77.)  At one point, Claimant's job changed so that she was wrapping cookies and wiping down the tables.  (AR 77-78.)  When it was busy, Claimant had to lift, push, and carry things.  (AR 78.)  When Claimant was assigned to a coffee station, she had to carry heavy coffeepots and do overhead lifting.  (AR 80.)  Claimant did the modified work for about a year before she finally complained about the pain and quit on February 1, 2005.  (AR 78-79.)

Claimant was unable to work because of her hands, arms, shoulders, neck, and lower back.  (AR 80-81.)  Claimant's CTS caused pain in her hands.  (AR 81.)  Claimant was borderline for diabetes and did not have hypertension.  (AR 81-82.)  Claimant had bilateral shoulder impingement that she stopped receiving treatment for and physical therapy did not help. (AR 82.)

Claimant was unable to lift very much and raise her hands overhead repetitively because of her shoulder problems.  (AR 82-83.)  She could occasionally lift overhead and she estimated that she could do so for approximately 10 minutes.  (AR 83.)  Claimant could reach out in front of her.  (AR 96.)  Claimant testified that it bothered her shoulders and her neck when she lifted more than 5 to 10 pounds.  (AR 88.)

Claimant was having numbness in her hands, especially when she was asleep.  (AR 84.) Repetitive movements, such as slicing, chopping something up, or cutting something with scissors, caused pain in the thumb and wrist.  (AR 84.)  Claimant was able to take care of her personal needs herself and hold onto smaller objects, such as pens and pencils.  (AR 84, 89, 96.)

Claimant experienced pain bending her neck down for a long period of time and keeping it in a fixed position, such as when she sat looking at a computer screen.  (AR 84.)   However, Claimant was able to move her neck from side to side.  (AR 85.)  Claimant could not stand for six hours a day if she was bending down or looking down for a long period of time because it would cause her neck pain.  (AR 86-87.)  Claimant stated that she could stand for less than a half

hour and walk for 45 minutes at one time.  (AR 87-88.)  Claimant could sit for approximately half an hour and then she had to get up and walk around or lay down to ease the pain.  (AR 85.)  Claimant testified that if she got inflamed, which she described as her lower back getting really hot and swelling up, she sat down or took her medication.  (AR 85-86.)  Claimant estimated that she would lie down for an hour a day.  (AR 89.)

Claimant was living with her husband, daughter, daughter's husband, and two grandchildren at her daughter's house.  (AR 89.)  Claimant usually got up at 9 and did a little bit of dishes and vacuumed her room.  (AR 89-90.)  Vacuuming her room did not cause her any pain.  (AR 90.)  She also did her own laundry.  (AR 99.)  Claimant did not cook for her grandchildren, take her grandchildren to school, or do yardwork.  (AR 99-100.)  Claimant estimated that she was away from her daughter's house about two days a week.  (AR 100.)  Claimant's extended family would come over for holidays.  (AR 101-02.)

Claimant drove, but her lower back and neck would hurt her if she sat for too long.  (AR 90.)  Claimant's back hurt her from her drive to the hearing, which was approximately a half hour.  (AR 90.)  Claimant went grocery shopping, but she was unable to push the cart because it would cause her arm to hurt.  (AR 90-91.)  Claimant went grocery shopping alone if it was just for light groceries and things, but went with her daughter to shop for heavier items.  (AR 102.)  Claimant helped bring the groceries in.  (AR 91.)  The only exercise Claimant got was walking around the house or going to the store.  (AR 102.)

Claimant attended church for an hour every Sunday, but she did not go out to dinner or visit friends and she did not have any hobbies.  (AR 91, 102.)  Claimant took care of her three pets by taking them outside to the backyard.  (AR 91-92.)  She passed the time by feeding her dogs and taking them outside.  (AR 103.)

Claimant watched TV for approximately 2 hours a day, but she was back-and-forth because she could not sit for too long.  (AR 92.)  Claimant took her mother to doctors' appointments, grocery shopping, and sometimes clothing shopping.  (AR 92-93.)  When she went to someplace like Target, she would walk around or sit down.  (AR 104.)  Claimant did not go over to her mother's house to visit or share meals.  (AR 93.)  Claimant went to the stores near

her house and went to the mall once in a great while.  (AR 94.)  The Bible was the only thing that Claimant read and she did not have any computer skills.  (AR 103.)

Claimant saw Dr. Chang for her medical treatment, but she just started going back on March 30, 2010.  (AR 94-95.)  Claimant was getting her medications during the past year, but she was not going for appointments because her copayment increased.  (AR 95.)

### B.   Hearing Testimony From the Second Hearing

Claimant appeared with counsel at the second hearing before the ALJ on July 5, 2013.  (AR 38-67.)[1]   There was a specific period being adjudicated, February 1, 2005, through December 31, 2010, which the medical expert and VE were informed.  (AR 39.)

Medical expert Dr. Arthur Brovender, a Board Certified orthopedic surgeon, testified telephonically during the hearing.  (AR 40-50.)  Dr. Brovender had reviewed exhibits 1F through 23F.  (AR 41.)  The ALJ stated that he intended to find that Claimant suffered from a medically severe combination of impairments, which included hypertension, diabetes mellitus, degenerative disc disease of the cervical spine and lumbar spine, a history of CTS, a history of bilateral shoulder impingement versus rotator cuff tendonitis, and exogenous obesity.  (AR 43.)  Dr. Brovender would not add or subtract from that list of medical problems.  (AR 43.)

Dr. Brovender referenced Claimant's July 23, 2008 x-rays of the cervical spine showing degenerative disc disease and spondylosis and of the lumbar sacral spine showing mild degenerative disc disease.  (AR 44.)  He also referenced Claimant's June 13, 2008 MRI of the cervical spine showing foraminal narrowing of the degenerative disc disease.  (AR 44.)

While discussing Claimant's low back, Dr. Brovender stated that there's nothing in the MRIs that show impingement of the nerve and Claimant had normal range of motion and motor neurological sensory examinations.  (AR 44.)  Dr. Brovender also stated that Claimant's cervical spine examinations are essentially normal.  (AR 45.)  Dr. Brovender referenced the mild notes regarding Claimant's CTS and that on May 11, 2007, there was mild bilateral CTS.  (AR 43-45.)  He concluded that from February 1, 2005, through December 31, 2010, Claimant did not meet or

---

[1] Claimant was late to the hearing, but was present during the testimony of Mr. Dettmer and most of the testimony of Dr. Brovender.  (AR 38.)

equal a listing orthopedically.  (AR 45.)  When asked his opinion of Claimant's bilateral shoulder impingement or rotator cuff tendonitis, Dr. Brovender responded that Claimant had a full range of motion and that it usually goes away with conservative treatment.  (AR 45.)

Dr. Brovender determined that Claimant would fall within the light exertional category with occasional bending, squatting, and kneeling, and no climbing of ropes, ladders, and scaffolding.  (AR 45-46.)  Claimant could occasionally bilaterally reach overhead and occasionally do gross and fine manipulation.  (AR 46.)  Dr. Brovender stated that depending on what gross and fine manipulations Claimant did, Claimant's CTS could be exacerbated and made worse.  (AR 46-47.)  He also found that Claimant should be kept off of unprotected heights.  (AR 47.)  Dr. Brovender found that Claimant did not have a restriction for sitting and that she could stand for two hours and walk for two hours for a total of four hours in a day because of her obesity aggravating the low back.  (AR 49.)

Dr. Brovender thought that Dr. Dale Van Kirk's comprehensive orthopedic evaluation was really well done.  (AR 47, 573-77.)  When asked why he reached different conclusions than Dr. Van Kirk, Dr. Brovender stated that he had the advantage of looking at the entire file and that he was looking at it from the point of view of Social Security.  (AR 47-48.)  Dr. Brovender stated that Dr. Van Kirk may have been factoring in Claimant's diabetes when assessing limitations regarding cold weather and damp environments.  (AR 48.)

VE David Dettmer, a vocational rehabilitation counselor, also testified during the hearing.  (AR 39-41, 50-64.)  The VE stated that Claimant's past relevant work was as a caterer/helper as light, SVP 3 in the Dictionary of Occupational Title ("DOT"), but as medium 3 or 4 as actually performed by Claimant.  (AR 50.)  The VE stated that as that job is generally performed in the economy, it sometimes is light and sometimes is medium.  (AR 52.)

The first hypothetical that the ALJ asked involved an individual who is limited to medium work with occasional climbing, stooping, crouching, and crawling, has no more than frequent overhead reaching with the bilateral upper extremities, needs to avoid all exposure to extreme cold and to extreme dampness, needs to avoid concentrated exposure to pulmonary

6

irritants and vibration, and has the ability to continuously operate foot controls. [2]  (AR 54-56.) The VE found that the individual in the first hypothetical would be able to perform the caterer/helper position.  (AR 56.)

The second hypothetical that the ALJ asked involved an individual restricted to between light and medium levels of exertion, the ability to lift and carry is restricted to 20 pounds occasionally and 10 pounds frequently, no restrictions on standing, walking, and sitting, can do occasional postural activities, has no more than frequent overhead reaching with the bilateral upper extremities, needs to avoid all exposure to extreme cold and to extreme dampness, and needs to avoid concentrated exposure to pulmonary irritants and vibration.  (AR 56.)  The VE found that the individual in the second hypothetical would not be precluded from the caterer/helper position.  (AR 56-57.)

Claimant's counsel asked a hypothetical that involved an individual restricted to light work, except that the person can be on their feet only four hours total during an eight hour day. (AR 59.)  The VE found that the individual would be marginally employable and could not do Claimant's past relevant work for an eight hour work day.  (AR 60.)

Claimant's counsel then asked a hypothetical that involved the individual in the ALJ's second hypothetical, but that individual is restricted to no more than occasional use of the upper extremities for gross and fine manipulation.  (AR 60.)  The VE found that the individual could not do Claimant's past relevant work as a caterer/helper.  (AR 60.)

The VE stated that the caterer/helper position never has to stoop according to the Selected Characteristics, Dictionary of Occupational Title ("SCDOT").  (AR 60-62.)  The VE opined that the job of caterer requires an individual to reach forward with the upper extremities more than occasionally.  (AR 62.)

The ALJ then asked a third hypothetical which was based on the individual in the ALJ's second hypothetical, except that the individual also is limited to occasional gross and fine manipulation.  (AR 63.)  The VE stated that the individual would be precluded from performing

---

[2] The ALJ defined concentrated exposure as continuous, intractable, unremitting exposure.  (AR 55.)

that job as a caterer/helper.  (AR 63.)

The ALJ then asked if the individual in the ALJ's third hypothetical was someone between 51 and 56 who has a ninth grade education and the caterer/helper position in their background, would that person be able to do other jobs.  (AR 63-64.)  The VE stated that there is only a limited number of jobs because of the occasional manipulation restriction.  (AR 64.)

## C.     ALJ Findings

The ALJ made the following findings of fact and conclusions of law:

- •     Claimant last met the insured status requirements of the Social Security Act on December 31, 2010.

- •     Claimant did not engage in substantial gainful activity during the period from her alleged onset date of February 1, 2005, through her date last insured of December 31, 2010.

- •     During the period adjudicated, and through the date last insured, the Claimant had the following medically severe combination of impairments: hypertension, diabetes mellitus, degenerative disc disease of the cervical and lumbar spine, CTS, and a history of bilateral shoulder impingement versus rotator cuff tendonitis, and exogenous obesity.

- •     Claimant did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.

- •     Claimant had the residual functional capacity to perform a wide range of light work as defined in 20 CFR 404.1567(c). She was able to lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand, walk, and sit without limitation; occasionally climb, bend, stoop, kneel, crouch, and crawl; and frequently reach overhead with both upper extremities.  She had to avoid all exposure to extreme cold and dampness and avoid concentrated exposure, i.e., intense, continuous, intractable, unremitting exposure, to pulmonary irritants and vibration.

- •     Claimant was capable of performing past relevant work as a caterer helper

(319.677-014, light performed at medium, svp 3 performed at svp 3 to 4).  This work did not require the performance of work-related activities precluded by Claimant's residual functional capacity.

- Claimant was not under a disability as defined in the Social Security Act at any time from February 1, 2005, the alleged onset date, through December 31, 2010, the date last insured.

(AR 16-28.)

### III.

### LEGAL STANDARD

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Social Security Regulations set out a five step sequential evaluation process to be used in determining if a claimant is disabled.  20 C.F.R. § 404.1520; Batson v. Commissioner of Social Sec. Admin, 359 F.3d 1190, 1194 (9th Cir. 2004).  The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.

Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work? If so, proceed to step three. If not, the claimant is not disabled.

Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.

Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.

Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits.  42 U.S.C. § 405(g).  In reviewing findings of fact in respect to the denial of benefits, this court "reviews the Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error."  Hill v. Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012).   "Substantial evidence" means more than a scintilla, but less than a preponderance.  Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal quotations and citations omitted).  "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion."  Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

"[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence."  Hill, 698 F.3d at 1159 (quoting Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006).  It is not this Court's function to second guess the ALJ's conclusions and substitute the court's judgment for the ALJ's.  See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").

## IV.

## DISCUSSION AND ANALYSIS

Plaintiff raises five issues in this appeal.  Plaintiff argues that the ALJ erred by: (1) giving reduced weight to the opinion of Dr. Robert Henrichsen, an examining physician; (2) giving reduced weight to the opinion of Dr. Brenda Chang, a treating physician; (3) relying on Dr. Robert England's opinion; (4) rejecting part of the opinion of Dr. Arthur Brovender, the medical expert at Claimant's second hearing; and (5) giving substantial weight to the opinion of Dr. Dale Van Kirk, an examining physician.  The Court reviews whether there is substantial evidence to support the ALJ's finding.  See Hill, 698 F.3d at1158.

The weight to be given to medical opinions depends upon whether the opinion is

proffered by a treating, examining, or non-examining professional.  See Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995).  In general, a treating physician's opinion is entitled to greater weight than that of a nontreating physician because "he is employed to cure and has a greater opportunity to know and observe the patient as an individual."  Andrews v. Shalala, 53 F.3d 1035, 1040-41 (9th Cir. 1995) (citations omitted).  If a treating physician's opinion is contradicted by another doctor, it may be rejected only for "specific and legitimate reasons" supported by substantial evidence in the record.  Ryan v. Commissioner of Social Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) (quoting Bayless v. Barnhart, 427 F.3d 1121, 1216 (9th Cir. 2005)). While the ALJ must consider the treating physician's opinion, it "is not necessarily conclusive as to either physical condition or the ultimate issue of disability."  Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989).  The ALJ is not bound by the treating physician's opinion on disability, but cannot reject the opinion without presenting legally sufficient reasons to do so.  See Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998).

Similar to a treating physician, the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record.  Lester, 81 F.3d at 831.  Greater weight is afforded to the opinion of an examining physician than a non-examining physician.  Andrews, 53 F.3d at 1041.

Where the treating physician's opinion is contradicted by the opinion of an examining physician who based the opinion upon independent clinical findings that differ from those of the treating physician, the nontreating source itself may be substantial evidence, and the ALJ is to resolve the conflict.  Andrews, 53 F.3d at 1041.  However, if the nontreating physician's opinion is based upon clinical findings considered by the treating physician, the ALJ must give specific and legitimate reasons for rejecting the treating physician's opinion that are based on substantial evidence in the record.  Id.  The contrary opinion of a non-examining expert is not sufficient by itself to constitute a specific, legitimate reason for rejecting a treating or examining physician's opinion, however, "it may constitute substantial evidence when it is consistent with other independent evidence in the record."  Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).

///

**A.      The ALJ Properly Gave Reduced Weight to Dr. Henrichsen's 2006 Opinion**

First, Plaintiff argues that the erred in failing to include the limitations from Dr. Henrichsen's 2006 opinion in the RFC finding.  Plaintiff argues that the ALJ erred by: (1) Not providing any reasons for giving reduced weight to Dr. Henrichsen's 2006 opinion; and (2) Even if the ALJ's reasons for giving reduced weight to Dr. Henrichsen's 2004 opinion apply to Dr. Henrichsen's 2006 opinion, these are not specific and legitimate reasons.  Defendant counters that the ALJ found that the same reasons for giving reduced weight to Dr. Henrichsen's 2004 opinion applied to Dr. Henrichsen's 2006 opinion.  Defendant also argues that the ALJ properly gave specific and legitimate reasons for giving reduced weight to Dr. Henrichsen's 2006 opinion.

With regard to Dr. Heinrichsen's opinion, the ALJ found:

> On November 3, 2004, Robert Henrichsen, M.D. evaluated the claimant.  Dr. Henrichsen diagnosed right shoulder impingement, left shoulder subacromial clicking, bilateral carpal tunnel symptoms, and degenerative arthritis of the cervical spine (Ex. 16F30).  He noted objective evidence supported findings of some limitation of the neck, **slight** impingement of the right shoulder, and **minimal** amount of impingement in the left shoulder plus symptoms suggestive of carpal tunnel syndrome, although he noted the nerve conduction test did not support a diagnosis of CTS (Ex. 16F31).  He opined she should not use her elbows above shoulder level more than 40% of the time, repetitively grip or grasp, or repetitively use her neck (Ex. 16F33).  I give Dr. Henrichsen's opinion reduced weight because he overstates the claimant's limitations, as shoulder x-rays showed only mild degenerative changes, and the nerve conduction study showed no CTS.  Further, the claimant's failure to seek treatment for her shoulder problems in a timely manner suggest they are not as severe as alleged.
>
> . . .
>
> On January 18, 2006, Dr. Henrichsen reevaluated the claimant.  At that time, she had more symptoms in the left arm than the right arm (Ex. 16F4).  Dr. Henrichsen diagnosed bilateral shoulder arthritis causing impingement, degenerative disc disease of the cervical spine, and right carpal tunnel syndrome (Ex. 16F9), but did not change his opinion from November 2004 (Ex. 16F11-13).

(AR 25-26) (emphasis in original.)

1.      The ALJ's Reasons for Giving Reduced Weight to Dr. Henrichsen's 2004 Opinion Also Apply to Dr. Henrichsen's 2006 Opinion

First, the Court addresses whether the ALJ provided any reasons for giving reduced weight to Dr. Henrichsen's 2006 opinion.  Plaintiff argues that the ALJ erred because he did not provide any reasons for giving reduced weight to Dr. Henrichsen's 2006 opinion.  Defendant

1  counters that the ALJ's reasons for giving reduced weight to Dr. Henrichsen's 2004 opinion also

2  apply to Dr. Henrichsen's 2006 opinion because the ALJ noted that the 2006 opinion did not

3  change from 2004.

4       The ALJ noted that Dr. Henrichsen did not change his opinion from the November 2004

5  evaluation to the January 2006 evaluation.  (AR 26.)  Dr. Henrichsen stated in his 2006

6  evaluation that "[m]y overall recommendation for treatment has not changed since my previous

7  evaluation of November 3, 2004, nor has her overall level of disability."  (AR 536.)  Dr.

8  Henrichsen also stated that he had no change in opinion regarding her ability to work.  (AR 537.)

9  Therefore, the Court finds that it appears that the ALJ gave reduced weight to Dr. Henrichsen's

10 2006 opinion for the same reasons that he gave reduced weight to his 2004 opinion.  (AR 26.)[3]

11      The Court next evaluates whether the reasons for giving reduced weight to Dr.

12 Henrichsen's controverted opinion are specific and legitimate and supported by substantial

13 evidence.

14      2.    The ALJ Provided Specific and Legitimate Reasons Supported by Substantial
              Evidence for Giving Reduced Weight to the Opinion of Dr. Henrichsen

15

16      The ALJ provided three reasons for giving reduced weight to Dr. Henrichsen's opinion:

17 (1) Dr. Henrichsen overstated Claimant's limitations because shoulder x-rays showed only mild

18 degenerative changes; (2) Dr. Henrichsen overstated Claimant's limitations because the nerve

19 conduction study showed no CTS; and (3) Claimant's failure to seek treatment for her shoulder

20 problems in a timely manner suggest they are not as severe as alleged.  (AR 26.)

21      a.    **The ALJ properly considered that Claimant's mild shoulder x-rays do not
              support Dr. Henrichsen's opinion**

22

23      The first reason that the ALJ gave for giving reduced weight to Dr. Henrichsen's opinion

24 was that Dr. Henrichsen overstated Claimant's limitations because shoulder x-rays showed only

25 mild degenerative changes.  (AR 26.)  The ALJ need not accept a treating physician's opinion

26

27 [3] As the Court finds that this matter should be remanded for further proceedings regarding the RFC finding for
   sitting, standing, and walking limitations, the ALJ may want to specifically address the weight that should be given

28 to Dr. Henrichsen's 2006 opinion.

that is brief, conclusory, and unsupported by clinical findings.  Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).

Plaintiff argues that Dr. Henrichsen never termed Claimant's shoulder x-ray results as "mild."  Dr. Henrichsen noted in his 2006 opinion that new x-rays were not obtained or reviewed.  (AR 534.)  In his 2004 opinion, Dr. Henrichsen stated that "x-rays of the shoulders right and left demonstrate the left shoulder is normal.  The right shoulder has AC joint degenerative arthritis."  (AR 555.)  Although Dr. Henrichsen did not term Claimant's shoulder x-ray results as mild, the reports for Claimant's left and right shoulder x-rays indicate mild degenerative changes at the acromioclavicular joint and no indication of calcific tendonitis.  (AR 560, 562.)  Therefore, the ALJ set forth a valid reason when he found that Claimant's shoulder x-rays showed only mild degenerative changes.

Plaintiff contends that there was additional objective support for Dr. Henrichsen's opinion by 2006.  Plaintiff points to x-rays of Claimant's cervical spine, MRIs of Claimant's shoulders and cervical spine, and clinical findings from Dr. Henrichsen's examinations of Claimant.  The fact that there may be a piece of medical evidence supporting Dr. Henrichsen's opinion is not sufficient to overturn the ALJ's decision.  The Court must evaluate whether there is relevant evidence which a reasonable person might accept as adequate to support the ALJ's conclusion.  See Hill, 698 F.3d at 1159 (citations omitted).  Here, the ALJ set forth and evaluated the medical evidence in his decision.  (AR 19-28.)

Dr. Henrichsen stated in his 2006 opinion that "[p]revious x-rays demonstrate degenerative arthritis of the cervical spine.  Previous x-rays of the right shoulder on November 3, 2004 demonstrate AC joint degenerative arthritis."  (AR 534).  In Dr. Henrichsen's 2004 opinion, he stated that "[x]-rays, AP and lateral of the cervical spine with oblique films are presented.  There is degenerative arthritis of the cervical spine involving the intervertebral joint and the Luschka joints."  (AR 555.)  The cervical spine x-ray noted small ventral spurs from C4-C7 and degenerative disc disease at C5-C6, where the disc space was mildly to moderately narrow.  (AR 561.)

Dr. Henrichsen noted in his 2006 opinion that Claimant had an MRI scan of her right

shoulder on October 12, 2004, and an MRI scan of her left shoulder and cervical spine on October 13, 2004.  (AR 529-30.)  The MRI scan of the right shoulder indicated impingement and tendinopathy of the rotator cuff, with the impingement of the rotator cuff under the AC joint secondary to AC joint arthritic changes.  (AR 529.)  The MRI scan of the left shoulder indicated degenerative disease of the AC joint, which was producing impingement on the supraspinatus tendon, as well as tendinopathy of the rotator cuff and a metal artifact indicating prior surgery.  (AR 530.)  Dr. Henrichsen found that the MRI scans were "consistent with her examination of tenderness over the AC joint in that she has degenerative change of the AC joints on both sides producing some impingement of the rotator cuff area."  (AR 534.)  The MRI scan of Claimant's cervical spine demonstrated mild segmental cervical stenosis from C3-C4 through C6-C7 with minimal neural foraminal narrowing, disc bulge at C6-C7 more than at C4-C5, and multilevel degenerative disease.  (AR 530.)  Dr. Henrichsen noted in his July 14, 2005 letter that Dr. Vaezi identified "some impingement of the shoulders on the MRI scan."  (AR 543.)

During the 2004 examination, Dr. Henrichsen noted that Plaintiff had tenderness of the cervical spine in the paraspinal region at the level of C6 in the midline and that her cervical spine range of motion was 85% of normal.  (AR 553.)  Dr. Henrichsen found that there was evidence of impingement syndrome on the right and evidence of subacromial tendinitis on the left.  (AR 553.)  The tests caused pain in the posterior deltoid and Claimant had some tenderness anteriorly about the right and left shoulder, but only a slight amount.  (AR 554.)  Claimant had right shoulder pain with the wrist extension flexion test for cubital tunnel syndrome.  (AR 554.)  Claimant had shoulder pain with the Phalen's maneuver on her right side.  (AR 555.)  Dr. Henrichsen noted that Claimant's "true hardcore objective findings are some disability of her neck, a slight amount of impingement in her right shoulder and a minimal amount in the left shoulder."  (AR 556.)

Dr. Henrichsen's examination in 2006 revealed that Claimant could shrug her shoulders and activate the trapezius, adduct the scapulae together posteriorly and contract the interscapular muscles, resist a palm against hers and not demonstrate winging at the scapulae, properly activate the deltoid musculature when abducting the shoulders against the resistance of elbows,

1  and press her palms together in front of her chest and contract the pectoral muscular system.

2  (AR 532.)  There was no evidence of parascapular muscle atrophy.  (AR 532.)  Dr. Henrichsen

3  noted that there was evidence of impingement syndrome in the right more than the left shoulder.

4  (AR 532.)   Claimant had shoulder range of motion in flexion 110/110 degrees, abduction

5  150/150, external rotation 90/90, internal rotation 90/90, extension 50/50, and adduction 40/40

6  degrees.  (AR 532.)  Claimant's subscapularis lift off test demonstrated normal function, but she

7  had pain in the superior part of the right shoulder with O'Brien's test.  (AR 532.)  She did not

8  have biceps pain with supination resistance, Yergason's anterior flexion resistance, and reverse

9  Yergason posterior extension resistance of the shoulder.  (AR 532.)  Claimant had pain in the

10  shoulders from the forearm flexor and extensor loading test for flexor and extensor tendinitis.

11  (AR 533.)  Dr. Henrichsen was not able to explain why Claimant had shoulder pain while testing

12  for tendinitis of the elbow, because Claimant should not have shoulder impingement from that

13  test.  (AR 535.)  Dr. Henrichsen noted that based on testing results, Claimant was generally on a

14  regular basis using her upper extremities normally and equally.  (AR 536.)  Dr. Henrichsen noted

15  that Claimant's pain and numbness in the cervical spine were intermittent and slight, right

16  shoulder symptoms were intermittent and slight-moderate, and left shoulder symptoms were

17  intermittent and slight.  (AR 537.)

18      Therefore, although Dr. Henrichsen stated that he based his opinion on an examination of

19  Plaintiff, his physical examination findings show minimal abnormality and actually provide

20  substantial evidence for the ALJ's decision.  When the Court considers Claimant's x-rays of the

21  cervical spine and the MRIs of the cervical spine and shoulders in conjunction with the other

22  evidence in the record, the Court finds that there is substantial evidence to support the ALJ's

23  decision.

24      Accordingly, the ALJ provided a specific and legitimate reason supported by substantial

25  evidence for giving reduced weight to Dr. Henrichsen's opinion when he stated that Dr.

26  Henrichsen overstated Claimant's limitations because Claimant's shoulder x-rays showed only

27  mild degenerative changes.

28  / / /

**b.   The ALJ properly considered that Claimant's mild shoulder x-rays do not support Dr. Henrichsen's opinion**

The second reason that the ALJ gave for giving reduced weight to Dr. Henrichsen's opinion was that Dr. Henrichsen overstated Claimant's limitations as Claimant's nerve conduction study showed no CTS.  (AR 26.)     Plaintiff argues that the nerve conduction study reviewed by Dr. Henrichsen in 2004 was actually positive, and therefore, the ALJ should not have given reduced weight to Dr. Henrichsen's opinion based on the nerve conduction study. Defendant counters that the 2003 EMG study was normal and the findings were not diagnostic of CTS.

In his 2004 opinion, Dr. Henrichsen stated:

A EMG/NCV report of June 3, 2003, authored by Marina Bulatov, M.D. was present.  The EMG part of the study was normal.  The nerve conduction velocity of the motor median nerve motor latency was 4.1/3.9.  The ulnar nerve motor was 2.8/3.0.  The sensory study was median nerve 3.5/3.6 and ulnar nerve 2.9/3.1.

(AR 548.)

Dr. Henrichsen also found in his 2004 evaluation that:

It appears that a lot of the judgments in her situation have been made based upon subjective symptoms and her findings of pain and limitation of motion.  Her true hardcore objective findings are some disability of her neck, a slight amount of impingement in her right shoulder and a minimal amount in the left shoulder. There are controversial findings suggestive but not diagnostic of carpal tunnel syndrome of both upper extremities.  It does remain appropriate for physicians to have true hardcore findings well substantiated by subjective symptoms and imaging studies and in this specific case there is not very good correlation of the overall picture of the information currently present.

(AR 556.)

Defendant is correct that the 2003 EMG part of the study was normal.  (AR 548.)  Dr. Henrichsen noted the nerve conduction study test results for the nerve conduction velocity of the motor median nerve latency, ulnar nerve motor, and sensory study for the median nerve and ulnar nerve.  (AR 548.)  Dr. Henrichsen found that the findings suggest, but do not diagnose CTS.  (AR 556.)  Dr. Henrichsen noted that Claimant's findings remain equivocal.  (AR 539-40.) In his discussion of Dr. Henrichsen's opinion, the ALJ stated that Dr. Henrichsen "noted the nerve conduction test did not support a diagnosis of CTS."  (AR 25-26.)  Therefore, as the nerve

findings suggested CTS, but were not diagnostic of CTS, the ALJ correctly found that the nerve conduction study showed no CTS.

Plaintiff argues that this was not a legitimate reason supported by substantial evidence because Dr. Henrichsen's 2006 examination revealed abnormal Tinel's and Phalen's signs on the right.

In Dr. Henrichsen's 2006 report, he found that Claimant had abnormal Tinel's and Phalen's signs in the right wrist.  (AR 537.)  However, Dr. Henrichsen noted that "when one really looks at her examination carefully it can be seen that she is using both of her upper extremities normally on a regular basis."  (AR 537.)  Dr. Henrichsen also noted that Claimant's grip strength was below standard, but it was inconsistent demonstrating lack of full effort.  (AR 537.)

The 2004 examination did not reveal positive signs for carpal tunnel.  Dr. Henrichsen noted that Tinel's tapping sign over the medial and radial ulnar nerve did not produce distal paresthesia, but there was some tenderness of the wrist with tapping over the medial nerve, but no good distal paresthesias.  (AR 555.)  The Phalen's wrist test was accomplished for 30 seconds without distal paresthesia occurring.  (AR 555.)

Therefore, the Court finds that there is substantial evidence to support the ALJ giving reduced weight to Dr. Henrichsen's opinion because Dr. Henrichsen overstated Claimant's limitations as nerve conduction studies showed no CTS.

The Court finds that the ALJ set forth the medical record and stated his reasons for giving reduced weight to the opinion of Dr. Henrichsen.  The ALJ met his burden "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."  Magallanes, 881 F.2d at 751 (quoting Cotton v. Bowen, 779 F2d 1403, 1408 (9th Cir. 1989)).[4]

---

[4] As the Court has found that the ALJ provided two specific and legitimate reasons supported by substantial evidence for giving reduced weight to Dr. Henrichsen's opinion, the Court declines to address the third reason the ALJ gave for giving reduced weight to Dr. Henrichsen's opinion, because even if Claimant's failure to seek treatment for her shoulder problems in a timely manner was not a specific and legitimate reason for giving reduced weight to Dr. Henrichsen's opinion, any error is harmless error.  See Carmickle v. Commissioner of Social Security, 533 F.3d 1155, 1162 (9th Cir. 2008) (citing Batson, 359 F.3d at 1197).

**B.     The ALJ Properly Evaluated Dr. Chang's Opinion**

Plaintiff also argues that the ALJ erred in giving reduced weight to Dr. Chang's opinion when he failed to give proper deference to the opinion of Dr. Chang as a treating source and the opinion expressed closest to Claimant's date last insured.  Plaintiff also contends that the ALJ failed to give specific and legitimate reasons for giving reduced weight to Dr. Chang's opinion.

Dr. Chang found that Claimant could sit 6 hours intermittently and stand/walk 2 hours intermittently, but had to lie down 1 hour during a workday.  (AR 564.)  Dr. Chang also found that Claimant had difficulty with repetitive movement such as grasping, chopping, and lifting, could lift up to 10 pounds, could lift up to 3 pounds frequently, could lift up to 4-5 pounds occasionally, could reach and handle for 2-3% of the workday, could grasp for 7-8% of the workday, and could feel, push, and pull for 50% of the workday.  (AR 564-65.)

1.     Dr. Chang's Opinion is Controverted by Dr. England's Opinion

Plaintiff takes issue with the level of deference afforded to Claimant's treating physician, Dr. Chang.  Plaintiff argues that Dr. Chang's March 2010 opinion is the most probative medical opinion of record as she was Claimant's treating physician from February 2008 until at least April 2010 and it was the opinion expressed closest to Claimant's date last insured.  In his reply, Plaintiff states that Dr. Chang's opinion is uncontroverted evidence that Claimant became disabled prior to the date last insured, because there is no other treating or examining physician's opinion of record from the time period of July 2008 to December 2012.  However, Plaintiff's argument is flawed because the relevant time period is from Claimant's alleged onset date of February 1, 2005, through Claimant's date last insured of December 31, 2010.  (AR 21.)  Although Plaintiff tries to isolate a part of the relevant time period during which there are no other treating or examining opinions, Dr. England's opinion on July 1, 2008 is evidence in contradiction of Dr. Chang's opinion.  Next, the Court evaluates whether the reasons the ALJ provided for giving reduced weight to Dr. Chang's controverted opinion are specific and legitimate and supported by substantial evidence.

/ / /

/ / /

2.    The ALJ Provided Specific and Legitimate Reasons Supported by Substantial Evidence for Giving Reduced Weight to the Opinion of Dr. Chang

The ALJ gave reduced weight to Dr. Chang's opinion because it is not consistent with the evidence, as Claimant testified she could lift 10 pounds and nothing in the medical evidence of records supports a finding of such limited grasping, reaching, or handling, particularly as nerve conduction tests did not confirm CTS.  (AR 27.)  The ALJ also gave reduced weight to Dr. Chang's opinion because Claimant's mild x-rays findings in the neck, shoulders, and back do not support Dr. Chang's rather severe limitations.  (AR 27.)

a.    **The ALJ erred in finding that Claimant's testimony that she could lift 10 pounds is inconsistent with Dr. Chang's opinion**

Plaintiff argues that Claimant's testimony that she could lift a bag of groceries weighing up to 10 pounds is not inconsistent with Dr. Chang's opinion that Claimant could lift up to 10 pounds.  Dr. Chang found that Claimant could lift up to 10 pounds, but could lift only 3 pounds frequently and only 4 to 5 pounds occasionally.  (AR 564-65.)  Defendant argues that Dr. Chang's opinion that Claimant could only lift 3 pounds frequently and 4 to 5 pounds occasionally was inconsistent with evidence in the record.  Defendant points to Claimant's testimony at the hearing before the ALJ that the heaviest amount of weight that she could comfortably lift was "between 5 to 10 lbs."  (AR 88.)  Defendant also points to Claimant's statement to Dr. England and her statement in the function report that she could lift between 5 to 10 pounds.  (AR 289, 424.)

Here, Dr. Chang's opinion that Claimant could lift up to 10 pounds is consistent with Claimant's statement that she could lift between 5 to 10 pounds.  Additionally, the fact that Claimant could lift 5 to 10 pounds is not necessarily inconsistent with Dr. Chang's finding that Claimant could lift only 3 pounds frequently and 4 to 5 pounds occasionally, as Claimant could have reasonably meant that she could only have lifted between 5 and 10 pounds once or a few times, and not enough times to qualify as "occasionally," which is up to 33% of the workday.  Therefore, the Court finds that this reason is not a specific and legitimate reason supported by substantial evidence for giving reduced weight to Dr. Chang's opinion.

1    However, any error is harmless because as discussed below, the ALJ provided other

2    specific and legitimate reasons supported by substantial evidence in the record for giving

3    reduced weight to Dr. Chang's opinion. See Carmickle, 533 F.3d at 1162 (citing Batson, 359

4    F.3d at 1197).

5           **b.    The ALJ properly considered that nothing in the medical evidence supports
                   Dr. Chang's limited grasping, reaching, or handling limitations, particularly
6                  as nerve conduction tests did not confirm CTS**

7    Plaintiff argues that Dr. Chang's grasping, reaching, or handling limitations are supported

8    by the results of electrodiagnostic testing which confirmed a diagnosis of CTS.  Plaintiff also

9    argues that Dr. Chang's opinion was based on examinations which revealed positive Tinel's and

10   Phalen's on both sides.  Defendant counters that the medical evidence in the record shows that

11   Claimant did not have CTS and did not have clinical results suggestive of the grasping, reaching,

12   or handling limitations assessed by Dr. Chang.

13   Dr. Chang stated that the clinical or laboratory abnormalities associated with the

14   diagnosis are a positive electromyogram and nerve conduction study.  (AR 564.)  In a progress

15   note on May 11, 2007, by Dr. Sun Duk Hansrote, it states:

16   Electrodiagnostic Report: These abnormal electrodiagnositc studies provide
     evidence for very mild conduction slowing in the B/L median nerve at the wrist
17   (carpal tunnel syndrome).  There is no electrophysiologic evidence of bilateral
     sensorimotor ulnar neuropathy or bilateral sensory radial neuropathy.
18
     Comment: In comparison with the previous study done in 03, no significant
19   difference noted.  While above findings are compatible with the diagnosis of mild
     CTS, these findings can be seen as an asymptomatic accompaniment of diabetes.
20   Clinical correlation is necessary.

21   (AR 408.)

22   Dr. Chang noted that the electrodiagnosic testing results could be compatible with a

23   diagnosis of mild CTS or an asymptomatic accompaniment of diabetes, so it was not clear that

24   the electrodiagnostic testing actually resulted in a diagnosis of CTS.  (AR 408.)  Dr. Chang noted

25   that clinical correlation was necessary to determine the reason for the results of the

26   electrodiagnostic testing.  (AR 408.)  Therefore, as the ALJ found, the test results did not

27   confirm a CTS diagnosis.  The very mild conduction slowing in the median nerve at the wrist as

28   evidenced in the 2007 nerve conduction study do not support Dr. Chang's finding of such limited

grasping, reaching, or handling.

The ALJ noted that nothing in the medical evidence supports a finding of such limited grasping, handling, or reaching. In Dr. Chang's 2010 questionnaire, she stated that the objective findings which she based her opinion on included positive Tinel's and Phalen's tests in both sides. (AR 564.) Dr. Chang noted that Claimant had Phalen's sign positive in both sides during a physical examination on February 7, 2008. (AR 406.) However, during a March 6, 2008 examination, Dr. Chang noted that Claimant's CTS was stable. (AR 403.)

On February 20, 2008, Stephen Willey, Claimant's physical therapist, noted that Claimant had a positive Tinel's test in the left hand. (AR 405.) However, Mr. Willey also noted that Claimant's left shoulder, wrists, and elbows were within normal limits for range of motion and Claimant had negative palpation of both wrists except for tenderness at carpal tunnel/flexor tendons. (AR 404-05.) On February 28, 2008, and March 18, 2008, Mr. Willey noted that there was "[s]till no sign of CTS Sx at this time." (AR 401, 403.)

On April 18, 2007, Dr. Yuen Pao Chen noted during an urgent care visit that Claimant had positive Tinel's and Phalen's test. (AR 410.) Dr. Chung, the pain specialist to whom Claimant was referred to by Dr. Chang, examined Claimant on April 30, 2008 and May 21, 2008. (AR 396-99.) The examinations revealed positive Tinel's sign bilaterally, but negative Phalen's sign. (AR 396-99.)

The ALJ noted that Dr. Michael Ciepiela, an orthopedic surgeon who performed a qualified medical evaluation of Claimant in September 2004, found "bilateral **mild** CTS." (AR 25) (emphasis in the original.) The ALJ also noted that during Dr. England's July 1, 2008 evaluation, he found that "there were **no findings of sensory changes and no radicular pain with compression of the carpal tunnel to support a diagnosis of CTS**." (AR 26, 425) (emphasis in the original.) Dr. England noted that pressure over Claimant's carpal tunnel did not reproduce any numbness or tingling in the hands. (AR 424.) Dr. England found that Claimant had normal fine finger movement, normal grip strength, normal tone, and sensation was intact using a pinwheel, except in the median nerve distribution where it was decreased. (AR 424.)

Dr. Henrichsen found that Claimant had abnormal Tinel's and Phalen's signs in the right

wrist on January 18, 2006.  (AR 537.)  However, Dr. Henrichsen noted that "when one really looks at her examination carefully it can be seen that she is using both of her upper extremities normally on a regular basis."  (AR 537.)  Dr. Henrichsen's November 3, 2004 examination did not produce distal paresthesia for the Tinel's tapping sign over the medial and radial ulnar nerve, but there was some tenderness of the wrist with tapping over the medial nerve, but no good distal paresthesias.  (AR 555.)  The Phalen's wrist test was accomplished for 30 seconds without distal paresthesia occurring.  (AR 555.)

Although it was after the date Claimant was last insured, during his December 19, 2012 examination, Dr. Van Kirk found that Claimant had range of motion in the wrist without pain or difficulty and a negative Phalen's test after one minute.  (AR 576.)  Dr. Van Kirk noted that Claimant did have a positive Tinel's test for irritability of the median nerve at the carpal tunnel at the right wrist, but it was localized in the palmar aspect of the right wrist, and did not send electrical shocks down into the hands or up the arm.  (AR 576.)  Her left wrist was negative for that test.  (AR 576.)  The Tinel's test for irritability at the ulnar nerve at the Guyon's canal was negative bilaterally at the wrist.  (AR 576.)  The Tinel's test for irritability at the ulnar nerve at the cubital tunnel was negative bilaterally at the elbows.  (AR 576.)  Dr. Van Kirk noted that Claimant had normal motor strength in her upper extremities bilaterally.  (AR 576.)

Therefore, while there are Tinel's and Phalen's sign tests in the record that reveal positive results, there are also negative results during the same timeframe.  (AR 396, 399, 403-06, 424-25, 537, 555, 576.)  Further, as discussed below, the ALJ properly relied upon Dr. England's opinion, which is also substantial evidence for giving reduced weight to Dr. Chang's opinion.  See Andrews, 53 F.3d at 1041.  "The ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence."  Tommasetti, 533 F.3d at 1041-42.  When the Court reviews the medical evidence in the record, the Court finds that there is substantial evidence in the record to support the ALJ's finding specific and legitimate finding that nothing in the record supports the finding of such limited grasping, handling, or reaching limitations, particularly as nerve conduction tests did not confirm CTS.

/ / /

### c. The ALJ properly considered that Claimant's mild x-rays in the neck, shoulders, and back do not support Dr. Chang's rather severe limitations

The ALJ also found that Claimant's mild x-rays in the neck, shoulders, and back do not support Dr. Chang's rather severe limitations. Plaintiff argues that this is an impermissibly vague reason that is not supported by the record. Plaintiff contends that Dr. Chang opined that Claimant could only stand/walk for 2 hours a day based on Claimant's cervical and lumbosacral disease. Although the ALJ cited to Claimant's mild x-ray findings in the neck, shoulder, and back, Plaintiff argues that the MRI showed herniated discs. Plaintiff argues that the ALJ impermissibly relied on only selective evidence in the record to support his findings. See Holohan v. Massanari, 246 F.3d 1195, 1207 (9th Cir. 2001.)

Claimant had an MRI of her back in 2004 that revealed that she had mild segmental cervical stenosis from C3-C4 through C6-C7 with minimal neural foraminal narrowing, disc bulge at C6-C7 more than at C4-C5, mild pressure upon the front of the cervical spinal cord at C3-C4, C4-C5, C5-C6 and C6-C7 demonstrating multilevel degenerative disease. (AR 530.) Plaintiff argues in the reply that MRIs and not x-rays show herniated discs and that even though there was no MRI report of the cervical spine after 2004, Dr. Chang offered examination findings to support her opinion.[5] The Court notes that the MRI revealed a disc bulge, and not a herniated disc, at C6-C7 more than at C4-C5. (AR 530.)[6] Further, the Court reviews the medical

---

[5] Plaintiff argued that the most common test utilized to detect a herniated disc is an MRI. Plaintiff cited "Lumbar Herniated Disc," University of Maryland Medical Center, http://umm.edu/programs/spine/health/guides/lumbar-herniated-disc, and http://umm.edu/programs/spine/health/guides/x-rays (last visited on October 3, 2016.)

[6] The Spine Center at the University of Maryland Medical Center states:

> Bulging discs are fairly common in both young adults and older people. They are not cause for panic. In fact, abnormalities that show up on MRIs, such as bulging or protruding discs, are seen at high rates in patients both with and without back pain. Most likely, some discs begin to bulge as a part of both the aging process, and the degeneration process of the intervertebral disc. A bulging disc is not necessarily a sign that anything serious is happening to your spine.

> A bulging disc becomes important when it bulges enough to cause narrowing of the spinal canal. If there are bone spurs present on the facet joints behind the bulging disc, the combination may cause narrowing of the spinal canal in that area. This is sometimes referred to as segmental spinal stenosis.

"Degenerative Disc Disease," University of Maryland Medical Center, http://umm.edu/programs/spine/health/guides/degenerative-disc-disease (last visited on December 30, 2016.)

1    examinations in the record below to see if there is substantial evidence to support the ALJ's

2    decision.

3          Plaintiff points to Claimant's x-rays of her cervical spine in February 2008.  (AR 421.)

4    Plaintiff argues that the February 2008 x-rays revealed moderate narrowing at C5-C6 and C6-C7,

5    and to a lesser extent at C4-C5.  (AR 421.)  However, Defendant argues, and the February 2008

6    x-ray results show that the impression was "[m]ild to moderate narrowing, mid and lower

7    cervical spine."  (AR 421.)  The x-rays of Claimant's lumbar spine in February 2008 reveal mild

8    narrowing of the L4-L5 disk space.  (AR 420.)  A July 23, 2008 x-ray report of the lumbar spine

9    shows that there is borderline or mild disc space narrowing at L4-L5, but an otherwise normal

10   spine.  (AR 426.)  A July 23, 2008 x-ray report of the cervical spine shows that there is

11   multilevel degenerative disc disease with slight reversal of the usual lordosis which may be

12   indicative of muscle spasm, but otherwise negative.  (AR 426.)

13         A review of Dr. Chang's examination findings reveals that on March 8, 2008, she found

14   that Claimant had right shoulder tenderness in the AC joint area and normal range of motion with

15   pain.  (AR 402.)  Dr. Chang's February 7, 2008 examination revealed no focal tenderness in the

16   neck, a spasm in the neck, mild paraspinal spasm in the lower back, negative single leg raising

17   test, and normal range of motion of the back with pain.  (AR 406.)

18         Plaintiff argues that Dr. Chung provided additional support for Dr. Chang's opinion.

19   Although Dr. Chung's April 30, 2008 and May 21, 2008 examinations revealed a positive

20   Hawkins sign on the right, tender cervical paraspinals, and several other positive findings, the

21   examinations also revealed that Hawkins was negative on the left, negative empty can, drop arm,

22   and shoulder shrug sign, and normal heel to toe walk.  (AR 396-99.)

23         Upon a review of the record, the Court notes that there are other relevant notes in the

24   record regarding Claimant's neck, shoulders, and back that support the ALJ's finding.  Dr. Gallo

25   found during his July 6, 2007 examination that Claimant could heel and toe walk.  (AR 408.)

26   Even though her spine had a decrease in forward flexion and she had lordosis of the lumbar

27   spine, Dr. Gallo found that there was no palpable spasm in Claimant's spine.  (AR 408.)

28         Dr. England noted that Claimant walked with a normal heel-toe gait, could heel walk and

1 toe walk, and did not need an assistive device.  (AR 425.)  Although Dr. England found that

2 Claimant had decreased range of motion in the cervical spine and the thoracolumbosacral spine,

3 he also found that Claimant had full range of motion of all joints in her upper extremities, normal

4 strength proximally and distally at 5/5, and normal reflexes in the upper extremities.  (AR 424.)

5 Dr. Henrichsen in 2004 noted that Claimant's "true hardcore objective findings are some

6 disability of her neck, a slight amount of impingement in her right shoulder and a minimal

7 amount in the left shoulder."  (AR 556.)  Dr. Henrichsen noted in 2006 that "when one really

8 looks at her examination carefully it can be seen that she is using both of her upper extremities

9 normally on a regular basis."  (AR 537.)

10 Dr. Van Kirk noted in 2012 that Claimant was able to sit comfortably in the examination

11 chair and get up and out of the chair, walk around the room, and get on and off the table without

12 difficulty.  (AR 575.)  Dr. Van Kirk found that Claimant had a normal Romberg test, could

13 satisfactorily tandem walk with one foot in front of the other, and could get up on her toes and

14 her heels.  (AR 575.)  Claimant was even able to squat down and take a few steps without

15 difficulty.  (AR 575.)  Claimant had generalized discomfort in her cervical area as well as

16 paracervical soft tissues including the trapezius musculature radiating into the shoulder girdle

17 bilaterally.  (AR 575.)  However, Claimant could "slowly, but surely [go] through a full range of

18 motion of the cervical spine."  (AR 575.)  Claimant had slight pain in the mid lumbar spine area,

19 but she had full range of motion.  (AR 575.)  Claimant had minimal pain in the shoulder girdles

20 bilaterally including the rotator cuff above and below the acromion.  (AR 576.)  Claimant had

21 full range of motion in her shoulders.  (AR 576.)  Claimant's motor strength was normal 5/5 and

22 her light touch and pinprick senses were intact in the upper and lower extremities bilaterally.

23 (AR 576.)

24 As stated above, "[t]he ALJ is the final arbiter with respect to resolving ambiguities in the

25 medical evidence."  Tommasetti, 533 F.3d at 1041-42.  Here, the ALJ evaluated the medical

26 evidence in the record and found that that Claimant's mild x-rays in the neck, shoulders, and

27 back do not support Dr. Chang's rather severe limitations.   The Court finds that medical

28 evidence in the record supports the ALJ's finding.  Accordingly, the ALJ gave a specific and

1 legitimate reason supported by substantial evidence for giving reduced weight to Dr. Chang's

2 opinion based upon Claimant's mild x-ray findings in the neck, shoulders, and back.

3         **C.     The ALJ Properly Relied on the Opinion of Dr. England**

4         Plaintiff also argues that the ALJ should not have relied upon Dr. England's opinion

5 because there are inconsistencies within his opinion.  Plaintiff argues that there are "significant

6 positive findings" in Dr. England's examination that are inconsistent with the finding that

7 Claimant had full range of motion and normal reflexes and sensation.

8         The ALJ gave substantial weight to the opinion of Dr. England, a consultative examiner,

9 who examined Claimant in 2008.  The ALJ stated:

10       On July 1, 2008, Robert England, M.D. performed a consultative examination of
         the claimant at the behest of the State agency.  On examination, Dr. England
11       diagnosed probable degenerative disc disease of the lumbar spine and cervical
         spine with radicular pain into the shoulders and noted there were **no findings of**
12       **sensory changes and no radicular pain with compression of the carpal tunnel**
         **to support a diagnosis of CTS** (Ex. 5F2).  He opined the claimant could lift
13       and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk
         6 hours in an 8-hour workday, and sit for 6 hours in an 8-hour workday with no
14       other limitations (Ex. 5F2).  I give Dr. England's opinion substantial weight.  The
         claimant's mild objective x-rays findings in the shoulders, neck, and back do not
15       support greater exertional limitations.

16 (AR 26) (emphasis in the original.)

17       Dr. England noted that during his examination Claimant had decreased range of motion

18 in her thoracolumbosacral spine, extension was to 5 degrees, forward flexion was 60 degrees,

19 right and left lateral bending was 20 degrees, and she had tenderness in her buttocks area and

20 down into the upper thigh area bilaterally.  (AR 424.)  Dr. England also noted that Claimant's

21 cervical spine had normal cervical curve, but range of motion was 45 degrees of right and left

22 lateral rotation and extension and forward flexion were 50% of normal.  (AR 424.)  Claimant's

23 sensation was intact using a pinwheel, except in the median nerve distribution where it was

24 decreased.  (AR 424.)  However, Dr. England also stated that Claimant had full range of motion

25 and normal reflexes and sensation.  (AR 425.)

26       While Dr. England's statement that Claimant had full range of motion and normal

27 sensation appears to be inconsistent with Dr. England's findings regarding range of motion,

28 substantial evidence exists in the record to support Dr. England's opinion regarding Claimant's

limitations and the reason that the ALJ gave for giving substantial weight to Dr. England's opinion.

For Claimant's upper extremities, Dr. England noted that Claimant had full range of motion of all joints, generalized tenderness in her shoulders over the clavicles and tips of the shoulders as well as the soft tissue and bone, normal 5/5 strength proximally and distally, normal fine finger movement, normal grip strength, tone was normal, no numbness or tingling in the hands when pressure applied over the carpal tunnel, normal reflexes at 2/4 and symmetric, and sensation was intact using a pinwheel except in the median nerve distribution where it was decreased.  (AR 424.)  Dr. England found that Claimant could walk normally in heel-to-toe gait, could heel walk and toe walk, and she does not need an assistive device.  (AR 425.)

These relatively normal examination findings regarding Claimant's upper extremities and Claimant's ability to walk support Dr. England's opinion.  As stated above, although Claimant's MRI of her shoulders revealed impingement, Claimant had full range of motion of her shoulders and was not limited by the impingement in her shoulders.  (AR 424.)  The October 13, 2004 MRI of Claimant's cervical spine showed only mild pressure upon the front of the cervical spinal cord at C3-C7 and mild segmental cervical stenosis from C3-C7 with minimal neural foraminal narrowing.  (AR 530.)  These mild cervical spine MRI results are not sufficient to find error in the ALJ's decision to give substantial weight to Dr. England's opinion.

The ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence. See Andrews, 53 F.3d at 1039–40 (9th Cir. 1995) ("The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities.") (citation omitted).  Accordingly, the ALJ did not err in giving substantial weight to the opinion of Dr. England because the opinion is supported by substantial evidence.

**D.    The ALJ Did Not Commit Reversible Error by Crediting Much, but Not All of Dr. Brovender's Opinion**

Plaintiff next contends that the ALJ erred in rejecting Dr. Brovender's opinion regarding Claimant's standing and walking limitations and gross and fine manipulation limitations.  The ALJ provided a general reason why he did not credit all of Dr. Brovender's opinion and a

specific reason for rejecting the standing and walking limitation.

The ALJ stated:

> On July 15, 2013, the Medical Expert testified that he had reviewed the entire medical record and thereon identified her medically determinable impairments as hypertension, diabetes, degenerative disc disease of the cervical and lumbar spine, carpal tunnel syndrome, bilateral shoulder impingement versus rotator cuff tendinitis, and exogenous obesity.  He noted, however, that she had mild MRI and clinical findings, including normal range of motion and normal sensory and neurological examinations.  Accordingly, he opined she did not meet a listing and could lift and/or carry 20 pounds occasionally, 10 pounds frequently, stand and walk a total of 4 hours in an 8-hour workday, sit without limitation, occasionally climb ramps and stairs, balance, stoop, kneel, crouch, crawl, and perform fine and gross manipulation, but should avoid unprotected heights.  I credit much of what the Medical Expert concluded, but not all because I do not think he was as focused on the important dates connected with this adjudication, as I am.  The limitation placed on standing and walking is directly contradicted (Exhibit 5F).

(AR 24.)

1.   The ALJ Properly Found that Dr. Brovender's Standing and Walking Limitations Were Directly Contradicted By Dr. England

Plaintiff argues that the ALJ erred in rejecting Dr. Brovender's opinion that Claimant was limited to standing and walking for a total of four hours based on Dr. England's opinion, because Dr. England's opinion was internally inconsistent.  In rejecting Dr. Brovender's standing and walking limitations, the ALJ cited to Exhibit 5F, which is Dr. England's evaluation and opinion. Dr. England noted that Claimant could walk with a normal heel-toe gait, could heel walk and toe walk, and did not need an assistive device.  (AR 24, 425.)  Dr. England opined that Claimant could stand and walk for 6 hours cumulatively.  (AR 425.)  Therefore, Dr. England's examination notes and opinion are a specific and legitimate reason supported by substantial evidence for rejecting Dr. Brovender's limitation for standing/walking.  See Thomas, 278 F.3d at 957 (recognizing that the ALJ need not accept the opinion of any physician that is brief, conclusory, and unsupported by clinical findings).  Thus, the ALJ did not err in rejecting part of Dr. Brovender's opinion because Dr. Brovender's standing and walking limitations were contradicted by Dr. England.

/ / /

/ / /

2.   <u>The ALJ's Belief that Dr. Brovender was Not as Focused on the Important Dates Connected With this Adjudication was Not a Specific and Legitimate Reason Supported by Substantial Evidence for Rejecting Part of Dr. Brovender's Opinion</u>

Plaintiff argues that the ALJ erred in finding that Dr. Brovender was not as focused on the important dates connected with this adjudication because there is no evidence that Dr. Brovender did otherwise.  Defendant counters that Dr. Brovender's opinion, and specifically the limitation to occasional fine and gross manipulation, did not have the record support from the relevant period.

Although the Court may draw reasonable inferences from the ALJ's opinion, <u>Magallanes</u>, 881 F.2d at 775, it cannot consider Defendant's post hac rationalizations.  "A reviewing court can evaluate an agency's decision only on the grounds articulated by the agency." <u>Ceguerra v. Sec'y of Health & Human Servs.</u>, 933 F.2d 735, 738 (9th Cir. 1991).  The Court analyzes the reason provided by the ALJ, which is that Dr. Brovender was not as focused on the important dates connected with the adjudication.

During the hearing, the ALJ specifically instructed Dr. Brovender that "the relevant period, at least the critical relevant period is February 1, 2005, through December 31, 2010. Now, to the extent that the medical evidence exists after that date, the issue then will be whether it fairly relates into that period and then what it says [ ] about how the claimant is doing after December 31, 2010. (AR 41.)  The ALJ asked Dr. Brovender, "[a]re you able to capture from an orthopedic standpoint what you think is significant, particularly during this time period that I mentioned earlier, 2005 to 2010?"  (AR 43.)  There is no evidence that Dr. Brovender did not focus on the relevant time period.  Therefore, the ALJ erred in not crediting all of Dr. Brovender's opinion by finding that Dr. Brovender was not as focused on the important dates connected with this adjudication.

3.   <u>Any Error by the ALJ for Providing a Reason for Not Crediting All of Dr. Brovender's Opinion that is Not Specific, Legitimate, and Supported by Substantial Evidence is Harmless</u>

Although the ALJ erred in rejecting part of Dr. Brovender's opinion based on the ALJ's belief that Dr. Brovender was not as focused on the important dates connected with this adjudication, any error was harmless because the ALJ's decision remains legally valid, despite

1   such error.  See Carmickle, 533 F.3d at 1162.  The ALJ properly rejected Dr. Brovender's

2   standing and walking limitations because they are contradicted by Dr. England's opinion.

3   Although the ALJ did not give a specific and legitimate reason for rejecting Dr. Brovender's

4   limitations for fine and gross manipulation, Dr. England and Dr. Reddy's opinions support the

5   ALJ's RFC finding regarding fine and gross manipulation.  Dr. England and Dr. Reddy's

6   opinions did not include any limitations for fine and gross manipulation.  (AR 26, 27.)  The ALJ

7   provided specific and legitimate reasons supported by substantial evidence for giving substantial

8   weight to these opinions.[7]  Therefore, as the ALJ's RFC finding regarding fine and gross

9   manipulation is supported by substantial evidence, any error by the ALJ for not providing a

10  specific and legitimate reason for rejecting Dr. Brovender's limitations for fine and gross

11  manipulation is harmless.  Thus, the ALJ did not commit reversible error in not crediting all of

12  Dr. Brovender's opinion.

### E.  The ALJ erred by Relying on Dr. Van Kirk's Sitting, Standing, and Walking Limitations

15      Lastly, Plaintiff argues that the ALJ's reliance on Dr. Van Kirk's opinion is misplaced.

16  Regarding Dr. Van Kirk, the ALJ stated:

> On December 19, 2012, Dale Van Kirk, M.D., performed a consultative orthopedic evaluation of the claimant at the behest of the State agency.  The latter complained of pain in the hands, shoulders, and lower back.  (Ex. 19F1).  On examination, she rose from a seated position, walked around the examination room, got on and off the examination table, tandem walked, got up on her toes and heels, and took a few steps while squatting without difficulty.  She had generalized discomfort in the cervical area and only slight pain in the lumbar area, but full range of motion in both areas (Ex. 19F3).  She also had minimal pain and full range of motion in the shoulders bilaterally, no pain in the wrists, normal grip strength, and negative Phalen's test and straight leg raising bilaterally (Ex. 19F4).  Dr. Van Kirk diagnosed chronic strain/sprain, moderate cervical degenerative disc disease, rotator cuff tendonitis, and unverified symptoms of carpal tunnel syndrome.  He opined the claimant could lift and/or carry 20 pounds occasionally and 10 pounds frequently, sit, stand, and walk without limitation, never work around temperature extremes, occasionally work around humidity and wetness, and frequently climb, stop, kneel, crouch, crawl, and reach overhead, but should not work repetitively with her arms overhead (Ex. 19F5 and Ex. 20F).  I give Dr. Van Kirk's opinion substantial weight because, giving the claimant the benefit of

---

[7] The Court notes that Plaintiff did not challenge the weight given to Dr. Reddy's opinion.  The ALJ gave Dr. Reddy's opinion substantial weight because claimant's mild x-rays findings in the shoulders, neck, and back could support a limitation to light work with occasional postural movements and reaching.  (AR 27.)

the doubt, her mild objective x-rays findings in the shoulders, neck, and back could support a limitation to light work with occasional postural movements and reaching, but does not support greater limitations.

(AR 27.)

1.    The ALJ's Reliance on Dr. Van Kirk's Sitting, Standing, and Walking Limitations for the RFC is Not Supported by Substantial Evidence

Plaintiff argues that because Dr. Van Kirk did not examine Claimant until approximately two years after the date last insured, his opinion has limited or no relevance to whether Claimant was disabled during the relevant time period.[8]

A retrospective diagnosis can support an ALJ's RFC conclusion, although it is entitled to less weight than the opinion of a physician who completed an examination during the relevant time period.  See Macri v. Chater, 93 F.3d 540, 545 (9th Cir. 1996) (citing Lombardo v. Schweiker, 749 F.2d 565, 567 (9th Cir. 1984) (per curiam)).

As discussed above, the Court finds that the ALJ gave specific and legitimate reasons supported by substantial evidence for giving Dr. England's opinion substantial weight.  The ALJ also gave substantial weight to Dr. Reddy, a reviewing physician, whose opinion Plaintiff does not challenge in the social security appeal.  (AR 26.)  Therefore, the ALJ relied upon the opinions of Dr. Reddy, Dr. England, and Dr. Van Kirk in formulating Claimant's RFC.

The ALJ found that Claimant could lift and carry 20 pounds occasionally and 10 pounds frequently.  (AR 22.)  This RFC finding was supported by Dr. Van Kirk's opinion that Claimant could lift and carry 20 pounds occasionally and 10 pounds frequently.  (AR 577.)  This limitation is also consistent with Dr. England and Dr. Reddy, who both opined that Claimant could lift and carry 20 pounds occasionally and 10 pounds frequently.  (AR 425, 428.)  Therefore, even if it was error to rely upon Dr. Van Kirk's opinion for the limitations associated with carrying and lifting, it was harmless error, because the carrying and lifting limitations were supported by Dr. England and Dr. Reddy's opinions.  As for the non-exertional limitations that Dr. Van Kirk assessed, they were consistent or more restrictive than Dr. England and Dr. Reddy's opinions.

---

[8] Plaintiff also argues that the ALJ's reasoning for giving substantial weight to Dr. Van Kirk's opinion is flawed because the ALJ impermissibly picked evidence to support his conclusion and ignored evidence that did not support his conclusion.

1   Therefore, even if Dr. Van Kirk's opinion regarding Claimant's non-exertional limitations is

2   disregarded, Dr. England and Dr. Reddy's opinions provide support for the non-exertional

3   limitations in the RFC.   However, as discussed below, the sitting, standing, and walking

4   limitations in the RFC are not supported by Dr. England and Dr. Reddy's opinion, so the Court

5   must evaluate whether it was error to rely upon Dr. Van Kirk's opinion regarding the sitting,

6   standing, and walking limitations.

7         The ALJ found that Claimant had no limitations for standing, walking, and sitting in the

8   RFC, which is consistent with Dr. Van Kirk's opinion that Claimant could sit, stand, and walk

9   without limitation.  (AR 27, 577.)  Although Dr. Van Kirk's opinion is largely consistent with

10  Dr. England's and Dr. Reddy's opinions, Dr. Van Kirk's opinion is not as restrictive for

11  standing, walking, and sitting.   (AR 424-25, 428-29, 435, 577.)   Dr. England opined that

12  Claimant could stand and/or walk for 6 hours cumulatively and sit for 6 hours cumulatively.

13  (AR 424-25.)  Dr. Reddy opined that Claimant could stand and/or walk for about 6 hours and sit

14  for 6 hours.  (AR 428-29, 435.)  Therefore, the ALJ gave greater weight to Dr. Van Kirk's

15  opinion regarding sitting, standing, and walking than Dr. England, who examined Claimant

16  during the relevant time period, and Dr. Reddy.  However, the ALJ did not explain why he gave

17  greater weight to Dr. Van Kirk's opinion than Dr. England and Dr. Reddy's opinions, especially

18  in light of the fact that Dr. Van Kirk did not examine Claimant until nearly two years after the

19  date last insured.

20        Further, based upon Dr. Van Kirk's notes, it is possible that Claimant's lower back

21  improved prior to Dr. Van Kirk's examination and sometime after Claimant's date last insured.

22  Claimant's application for disability benefits was based on pain and limitations related to her

23  hands, shoulders, neck, and lower back.  (AR 270.)  Although Dr. Van Kirk noted that during the

24  examination Claimant had slight pain that was localized in the mid lumbar spine area, Claimant

25  told Dr. Van Kirk that at the time of her examination she had pain in her neck and shoulders and

26  she had carpal tunnel symptoms.  (AR 574-75.)  If Claimant improved after the date last insured

27  and prior to Dr. Van Kirk's examination, then the limitations that Dr. Van Kirk assessed do not

28  accurately reflect Claimant's condition prior to the date last insured.  Therefore, the Court finds

that there is not substantial evidence to support the ALJ's finding as part of Claimant's RFC that Claimant could stand, walk, and sit without limitation.

> 2.   The ALJ's Error in Finding that Claimant Could Stand, Walk, and Sit Without Limitation is Not Harmless

The ALJ's error in finding that Claimant could stand, walk, and sit without limitation is not a harmless error, because if Claimant was limited to 6 hours of standing and/or walking and 6 hours of sitting, she could have been precluded from performing her past relevant work. The VE did not answer a hypothetical regarding an individual who was limited to 6 hours of standing and/or walking and 6 hours of sitting. Although the VE testified that an individual could do Claimant's past relevant work if the individual had no restrictions for sitting, standing, and walking, the VE testified that an individual who is limited to light work, except 4 hours of standing and/or walking and 4 hours of sitting could not do Claimant's past relevant work. (AR 56, 59-60.) Therefore, such error is not inconsequential to the ultimate nondisability determination. See Carmickle, 533 F.3d at 1162.

### F.   This Action Should be Remanded for Further Proceedings

Plaintiff seeks remand for benefits or alternately seeks a remand for further development of the record. Defendant argues that if the Court finds that the ALJ erred, the matter should be remanded for further development of the record.

The Court has the discretion to remand a case for either an award of benefits or for additional evidence. Smolen, 80 F.3d at 1292. The remand should be for "an award of benefits where (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." Id. District courts have flexibility in applying the credit as true rule. Connett v. Barnhart, 340 F.3d 871, 876 (9th Cir. 2003).

Here, there is no evidence in the record from the VE regarding whether a limitation to 6 hours of sitting and 6 hours of standing and/or walking would have precluded Claimant from performing her past relevant work or if the regulations would have permitted Claimant to

perform other jobs given such limitations.   Therefore, further development on the record is required to resolve this outstanding issue.

Accordingly, the Court recommends that this action be remanded for further development of the record to determine if a limitation to 6 hours of sitting and 6 hours of standing and/or walking would have changed the determination that Claimant was not disabled.

**V.**

**RECOMMENDATIONS**

Based on the foregoing, it is HEREBY RECOMMENDED that Plaintiff's appeal from the final decision of Defendant Commissioner of Social Security be GRANTED IN PART and remanded for further development of the record as discussed herein.

These findings and recommendations are submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304.   Within fourteen (14) days of the date of service of these findings and recommendations, any party may file written objections to these findings and recommendations with the Court and serve a copy on all parties.   Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."   The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C).   The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.   Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **February 6, 2017**

UNITED STATES MAGISTRATE JUDGE